AO 91 (Rev. 11/11) Criminal Complaint

# ORIGINAL

## UNITED STATES DISTRICT COURT

for the

Central District of California



United States of America,

v.

GUIA CABACTULAN, MARISSA DUENAS,
and AMANDA ESTOPARE,

Defendants.

Case No. F  LA 20-0354M

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the dates of in or around October 2013 to in or around December 2019, in the county of Los

Angeles, in the Central District of California, the defendants violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 371 | Conspiracy to Commit Immigration Fraud |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

Complainant's signature

Anne W. Wetzel, Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 1/27/20

Judge's signature

City and state:  Santa Ana, California

Honorable Autumn D. Spaeth, U.S. Magistrate Judge
*Printed name and title*

# **A F F I D A V I T**

I, Anne M. Wetzel, being duly sworn, hereby declare and state as follows:

## I.  **INTRODUCTION**

1.    I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI"), and have been so employed since March 2004.  Since October 2012, I have been assigned to the Los Angeles Field Office, Civil Rights Squad, and have worked at the Ventura Resident Agency since October 2016.  In that capacity, I am responsible for investigating human trafficking, among other related offenses.

## II. **PURPOSE OF AFFIDAVIT**

2.    This affidavit is made in support of a criminal complaint against and arrest warrants for GUIA CABACTULAN ("**CABACTULAN**"), MARISSA DUENAS ("**DUENAS**"), and AMANDA ESTOPARE ("**ESTOPARE**"), for conspiring to commit immigration fraud, in violation of Title 18, United States Code, Section 371.[1]

3.    The facts set forth in this affidavit are based upon information obtained from other law enforcement personnel, my personal knowledge, and my training and experience.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and warrants, and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all

---

[1] As alleged here, the elements of 18 U.S.C. § 371 are:
(1) There was an agreement between two or more persons to commit immigration fraud, in violation of 18 U.S.C. § 1546(a); and
(2) the defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it.

1

conversations and statements described in this affidavit are related in substance and in part only.

### III. STATEMENT OF PROBABLE CAUSE

**A.   Background**

4.   The FBI is conducting a criminal investigation into human trafficking and immigration fraud by individuals associated with a Filipino-based church called the Kingdom of Jesus Christ, The Name Above Every Name ("KOJC").  These crimes are being committed using the Children's Joy Foundation USA ("CJF"), which is a non-profit charity (a 501(c)(3)) in the United States operated by KOJC.

5.   The FBI's investigation has revealed that KOJC administrators **CABACTULAN, DUENAS,** and **ESTOPARE** conspired to submit false visa applications to the United States so that the United States would allow KOJC workers to be admitted into the country under false pretenses.  For instance, **DUENAS** provided a letter to a KOJC worker for her to give to immigration authorities telling them that the KOJC worker would travel to the United States to perform in a concert.  But once in the United States, **CABACTULAN, DUENAS,** and **ESTOPARE** -- along with their co-conspirators -- would take away the KOJC workers' passports and force them, including the above-referenced worker, to beg for and solicit donations across the country as "volunteers," working long hours nearly every day, year-round.  The conspirators referred to "volunteers" as Full Time Workers, or "FTWs," and tracked their daily fundraising.  KOJC workers often slept in cars overnight, parked at truck stops.  For those KOJC workers

who proved to be good at soliciting money, KOJC administrators, including **CABACTULAN, DUENAS**, and **ESTOPARE,** would force them into sham marriages so they could stay in the United States and continue soliciting.  Based on an analysis by United States Citizenship and Immigration Service ("USCIS"), which reviewed immigration records of known KOJC members, between March 19, 1999 and December 5, 2019, 82 marriages were entered by KOJC administrators and full-time solicitors.

6.    KOJC and CJF advertise that the solicited money will be used to aid Filipino children; however, little to no money solicited appears to benefit impoverished or in-need children. Instead, the money appears to directly finance KOJC operations, as directed by certain individuals associated with KOJC, and the lavish lifestyle of its leaders.  Subpoenaed bank records show that KOJC accounts received approximately $20 million in cash deposits from 2014 through mid-2019.  Based on witness interviews, subpoenaed bank records, and police reports, most of these funds appear to derive from street-level solicitation.

7.    The evidence also shows that KOJC workers are required to meet daily cash solicitation quotas set by KOJC/CJF administrators.  These daily quotas are increased during the months of September/October through January/February of the following year.  This period of increased quotas, which coincides with the United States holiday season, is often called the Month of Blessings or MOB.  According to victims who have left KOJC, victims receive various consequences for failing to meet cash solicitation quotas, including mental and physical abuse.

3

8.    For victims who prove capable of meeting the cash solicitation quotas, KOJC administrators seek to maintain the legal United States status of the workers by fraudulently obtaining student visas or by forcing the victims to engage in a fraudulent marriage with another member of KOJC who has already obtained United States citizenship.  These workers, in turn, stay in the United States and solicit year-round.

### B.    CABACTULAN's, DUENAS's, and ESTOPARE's Role in the Offense

9.    Based on witness interviews and documents received from victims who fled KOJC, as well as materials obtained through legal process, the main KOJC administrators in the United States were **CABACTULAN, DUENAS,** and **ESTOPARE.**  They were in charge of KOJC workers in the United States (and, in particular, within the Southern California area), and lived at the KOJC compound in Van Nuys, California, within the Central District of California (hereinafter referred to as the "Van Nuys Compound").

a.    **CABACTULAN** was the lead KOJC administrator in the United States, in charge of both **DUENAS** and **ESTOPARE.** **CABACTULAN** maintained direct communication with KOJC leadership. **CABACTULAN** previously had responsibility over financial reporting and the collection (and withholding) of passports from KOJC workers -- and also partook in coordinating misrepresentations to immigration authorities and fraudulent marriages for KOJC workers -- but has since taken on an overall leadership role in the United States.

4

b.    **DUENAS** was the human resources leader of KOJC in the United States.  **DUENAS** had responsibility over collecting and securing passports from KOJC workers; **DUENAS** would prevent KOJC workers from freely accessing their passports and other important documents.  **DUENAS** also handled fraudulent immigration-related documents for KOJC workers; in particular, **DUENAS** participated in applying for sham marriages and fraudulent student visas on behalf of KOJC workers to keep them in the United States so that they could continue soliciting money.

10.    **ESTOPARE** was in charge of the money and financial reporting of KOJC workers in the United States.  As shown below, **ESTOPARE** knew that the KOJC workers were predominantly soliciting funds as full-time workers instead of entering and remaining in the United States for the stated purpose in their immigration applications.  **ESTOPARE** provided daily quotas that each KOJC worker had to solicit each day, and each KOJC worker reported his or her daily fundraising totals to **ESTOPARE**.  **ESTOPARE** would punish KOJC workers who did not meet their daily solicitation goal or quota.  **ESTOPARE** was also in charge of directing the flow of the cash, including by instructing workers to make structured deposits that would avoid detection from banks, and by instructing KOJC workers flying to the Philippines to hide money in their socks and other clothing within their personal luggage so that the money could be presented to KOJC leadership in the Philippines.

C.   KOJC and CJF

11.   Based on www.kingdomofjesuschrist.org, on or about
September 1, 1985, KOJC was established in Davao, Philippines,
and was later brought to the United States.  According to the
website, KOJC "is a religious organization founded and led by the
Appointed Son of God."  KOJC reportedly has followers around the
world.  CJF was also founded in Davao, Philippines.  It was
created for the claimed purpose of assisting needy children.

D.   **Multiple KOJC Victim-Escapees Come Forward**

1.   **Victim A**

12.   On or about October 21, 2015, FBI SAs interviewed
Victim A, a former KOJC member who fled the organization.
Victim A provided the following information:[2]

a.   Victim A joined KOJC when she was approximately
seventeen years old and escaped in approximately 2014.  While a
member of KOJC, Victim A, and other KOJC workers, solicited
monetary donations to support KOJC and also the personal needs
of the workers.  KOJC did not pay the workers, and only a small
portion of the money collected by the workers went toward
supporting the living needs of the workers.

b.   Victim A wrote a "commitment letter" to KOJC and
its leader.  In her commitment letter, Victim A gave up all
"attachments" to her family.  After the commitment letter,

---

[2] On March 18, 2016, the FBI assisted Victim A in obtaining
continued presence relief, a form of temporary immigration
status that allowed her to remain in the United States, which
currently expires on February 21, 2021.  Victim A's eligibility
for relief was based on her status as a victim of trafficking
who was willing to assist in the investigation and prosecution
of traffickers.

Victim A became a member of the Pastoral Department and acted as a "pastoral" for the KOJC leader.  According to Victim A, as well as other victim-escapees whom the FBI interviewed, including Victim L[3] and Victim M,[4] pastorals worked as personal assistants to the KOJC leader.

> c.   When Victim A received her visa to travel to the United States, she did not know that she would be working and soliciting donations.  The visa's stated purpose was for KOJC musical performances and, when she first arrived in the United States, she did perform in concerts; however, Victim A was

---

[3] Victim L received continued presence relief on her own accord.  However, her ability to acquire temporary immigration status was aided, in part, by her cooperation with the FBI.  In approximately May 2016, Victim L obtained a T visa, which she currently holds, which is a type of visa allowing certain victims of human trafficking and immediate family members to remain and work temporarily in the United States, typically if they report the crime to law enforcement and agree to help them in the investigation and/or prosecution of the crime committed against them.  Victim L obtained the T visa on her own accord. In addition, in approximately July 2016, Victim L received a $500 payment from the FBI for taking time off from work to assist the FBI in reviewing and interpreting KOJC documents.

[4] On November 30, 2017, Victim M received continued presence relief, with the assistance of the FBI, which expires on October 1, 2021.  In addition, based on my review of court documents, I know that a criminal case was brought against Victim M in Hawaii by state authorities that was ultimately dismissed.  In summary, after Victim M left KOJC, an assistant to a KOJC administrator filed a missing person report.  Officers located Victim M, who told the officers that she ran away because she had been physically abused by the aforementioned KOJC administrator. When officers asked whether Victim M wished to press charges, she said yes.  Afterwards, the mother of a minor, who is part of KOJC, filed a complaint alleging that Victim M was in a sexual relationship with the minor.  Later, Victim M was arrested and charges were filed.  But the state criminal case was dismissed on or about November 21, 2019 after the minor withdrew her complaint citing confusion.

shocked when she was sent to New York to solicit for donations on behalf of KOJC.

d.    When Victim A first arrived in California, she was taken to the Van Nuys compound.  The premises had an office, and the workers were told to go to the office and give their passports to **CABACTULAN** for safe keeping.

e.    The workers were instructed by KOJC administrators to lie to the public about the donations when they were soliciting and not to mention KOJC or its leader.  The workers were instructed to provide donors with a fake receipt for their donations if asked.  If the workers were contacted by the police, they were instructed to say that they were raising money for children and not to involve the church.

f.    Once Victim A began soliciting in the United States, she was given a quota to meet each day, which caused her stress.  She and the other workers would be woken up at 4:00 a.m. or 5:00 a.m., and they would leave almost immediately to start working.  The workers would solicit all day until they hit their quota and were not given days off.  Workers would be forced to solicit even when they were sick, and might be physically punished if they failed to meet their quota.

g.    After the period of heightened quotas, referred to as the Month of Blessings, workers received an annual honorarium, which was essentially a cash reward.  The amount of the honorarium depended on how much money the member had collected during the Month of Blessings.  For 2013, Victim A

received an honorarium of 500 Philippine pesos.[5]  Besides the honorarium, Victim A was not paid for soliciting on behalf of KOJC.  Victim A stated that KOJC administrators told the workers that all their living needs were taken care of so all they had to worry about was collecting money.

h.    Workers who are very good at collecting money are called "Assets."  An Asset was considered too valuable to send back to the Philippines.  As such, CJF and KOJC would find a way for the Assets to stay in the United States.  Usually, CJF or KOJC would facilitate a marriage to another member of KOJC so that the Asset could stay in the United States.  Victim A knew of KOJC workers who were good at raising money that were married off for this purpose.

i.    Victim A was scared of KOJC because of all the stories that she had heard about members being "sanctioned" (i.e., punished) for leaving KOJC or stating something negative about KOJC or its leader.  Victim A believed, based on these stories, that if KOJC found her, she would be beaten or killed.

### 2.   Victim B

13.   On or about August 9, 2019, the FBI interviewed Victim B, who provided the following information:[6]

a.    Victim B was a former KOJC member who fled the organization in or around August 2019.  Victim B grew up in the

---

[5] In 2013, 500 Philippine pesos equaled approximately $11.85.

[6] Victim B received housing benefits through non-government organizations via FBI victim services on or about August 8, 2019.

9

Philippines and joined KOJC in 2009 when she was approximately
12 years old.  Victim B became a pastoral at the age of 14,
serving the needs of the KOJC leader.

       b.    Based on materials that I have seen during the
course of this investigation, including a template letter
provided by **DUENAS** to Victim B, addressed to immigration
authorities (discussed more fully below), as well as an FBI
interview with Victim B, I understand that Victim B often came
to the United States for KOJC, ostensibly to perform and attend
concerts.  Victim B typically stayed at the Van Nuys compound.
When KOJC workers came to the United States, **DUENAS** typically
kept the passports and identifying documents of the KOJC workers
in her office at the Van Nuys compound.

       c.    Victim B identified the leaders of KOJC at the
Van Nuys compound as **CABACTULAN, DUENAS,** and **ESTOPARE**.  Victim B
identified **ESTOPARE** as the KOJC chief financial administrator in
the United States.

       d.    The main responsibility of KOJC workers was to
raise money for the church.  Based on Victim B's administrative
role in KOJC, in which she had access to KOJC-worker
fundraising-reporting documents, Victim B stated:

          i.    KOJC workers typically raised funds by
soliciting on the streets, caroling in shops, restaurants, or
neighborhoods, and sometimes selling pastries or goods.

          ii.    KOJC workers fundraised nearly every day,
year-round, and worked very long hours.

iii.  KOJC workers were given a daily goal or quota of money to raise based on the individual worker's capacity.  KOJC workers worked until they reached their daily goal, typically starting early in the morning until late at night.

iv.  KOJC workers reported their fundraising totals at the end of each day to the financial leaders of each "Kingdom Light Congregation" ("KLC").[7]  The KOJC administrative department, led by **ESTOPARE** in the United States, kept track of the finances and fundraising totals.

v.  If a KOJC worker did not make their daily goal or quota, they were often punished by KOJC leaders, including **ESTOPARE,** by being yelled at, shamed, or berated. Victim A (noted above) similarly stated that workers might be physically punished if they failed to meet their quota. Likewise, Victim L (also noted above) stated that if a worker does not raise enough money to meet the daily goal, the worker is subjected to sanctions, including physical abuse.

vi.  Victim B also stated that **CABACTULAN** is a KOJC leader in charge of legal matters who lived at the Van Nuys compound.  According to Victim B, **CABACTULAN,** along with others, made a report to KOJC leadership about an accusation that Victim B was having a relationship with a non-KOJC male.  This resulted in Victim B being forced to go to the "Upper Six," where KOJC workers were sent for punishment and re-training.  At the Upper

---

[7] Based on my knowledge of this investigation, including interviews with KOJC victim-escapees, I understand that a KLC is a KOJC place of worship.

Six, Victim B was isolated for three to five days and forced to
fast and listen to prerecorded sermons from the KOJC leader.

(I)   Based on my knowledge of this
investigation, I understand that the Upper Six was a walled
compound used solely for punishment.  The purpose of Upper Six
was to "sanction" people that angered the church/pastor.
According to another victim with whom the FBI spoke on or about
February 10, 2016, Victim M (referenced above), I learned that
when Victim M arrived at the Upper Six, they shaved her head and
made her wear an orange shirt with "SOS" on the back, which
stood for "Son of Satan."  Victim M stated that on her first day
at Upper Six, she was hit on the back with a paddle
approximately 100 times.  According to Victim M, people in Upper
Six were assigned duties, and if the duties were not performed
perfectly, they were paddled.

14.   The FBI interviewed Victim B again on or about August
20, 2019, when Victim B provided the following information:

a.   Victim L, who was a KOJC worker and former
pastoral (as noted above), fled the organization in early 2015.
Victim L previously handled all the emails from and files for
KOJC workers reporting daily fundraising totals.  After Victim L
left the organization, Victim B took over those responsibilities
for a few weeks to finish the Month of Blessings.  Victim B
stated that **ESTOPARE** then took over the financials and reporting
from her, and has occupied that role ever since.

b.   Based on Victim B's experience as a KOJC
administrator, as well as Victim B's personal experience with

12

**DUENAS** taking Victim B's immigration documents, Victim B stated that **DUENAS** was the KOJC human resources department leader in the United States and was in charge of KOJC workers' paperwork, including passports, green cards, identifying documents, and visas.

        c.   Based on Victim B's personal experience, **DUENAS** set up fraudulent marriages for KOJC workers. **DUENAS** often traveled to the different KLCs throughout the United States to check on the status of the fraudulent marriages. Victim B stated that **DUENAS** had forced her to enter a fraudulent marriage.

    15.   On April 22, 2016 and May 10, 2016, the FBI obtained federal search warrants authorized by the Honorable Karen E. Scott, United States Magistrate Judge, United States District Court for the Central District of California (hereinafter collectively referred to as the "Email Search Warrant"), case numbers SA 16-212M and SA 16-241M, on two email accounts, one belonging to Victim B. During their review of the email accounts, agents observed communications about travel arrangements of the workers and leaders, groupings and goals of the workers, and income goals. Materials found under the Email Search Warrant corroborated statements made by Victim B. In particular, agents discovered the following:[8]

---

[8] A large portion of the email communications contained in the email accounts were written in the Tagalog language. A smaller portion of the email communications were written in English, but include coded words. A victim assisted FBI agents in deciphering some of the codes pertaining to the collection of money and the workers.

a.    During the review of emails obtained via the Email Search Warrant, a template letter was found. Specifically, in an email dated January 20, 2016, with the subject line "Invitation Letter.docx," **DUENAS** sent Victim B a letter addressed to the "Honorable Consul, United States of America."  The "RE" line read, "RE: Invitation for [blank] as GUEST for the LIVE Concert Crusade in UNITED STATES OF AMERICA." The body of the letter stated that the person named in the "RE" line was "one of our special guest for this Kingdom's Concert Crusade, [and] his presence in the concert schedule is deemed important.  Thus, the Kingdom's USA Chapter is sponsoring his stay in the country from [blank] to [blank] covering food and travel accommodation for the whole duration of the event."  The letter was signed by the "International Administrator" on letterhead for KOJC.  The letter listed the Van Nuys Compound as the Los Angeles, California address.

i.    Based on my training and experience, and knowledge of this investigation, I know that immigration-law offenders and human traffickers will provide fraudulent immigration-related documents to victims in order to facilitate their travel to other countries.  In the above example, while the letter states that the purpose of the trip is to perform in a concert, I know from speaking with victim-escapees that they were instead predominantly used to beg for money on the streets in order to raise money for KOJC administrators.  Notably, the letter does not state that Victim B (or the KOJC worker more generally) will be fundraising or soliciting money for KOJC or

14

CJF.

        b.    Another email that I have reviewed, dated August
7, 2015, from **DUENAS** -- "Marissa Duenas"
(marissa.duenas@kojc.net) -- subject line "usa manpower
updated," and forwarded to Victim B, was obtained from the Email
Search Warrant.  The email contained three Word document
attachments, one of which was titled, "MULTIPLE VISA FTMWS and
THEIR AVE.docx."[9]  This document included a table with the
following columns:  "Name in USA," "Status," "Ave.Income," and
"Area."  The column, "Name in USA," contained a list of 93
individuals; the column "Status" listed whether the individual
was a citizen, green card holder, student, or whether they
should "change status"; the column "Ave.Income," which,
according to Victim B, referred to the average money raised by a
solicitor per day, listed a number ranging from 50.00 to 561.26;
and the column "Area" listed the name of a city or a state.  The
names were further divided up into a group of "income" producing
"citizen[s]," which included certain names; and a group of "non-
income" "citizen[s]," which included other names, including
**ESTOPARE**.  Those listed under the "STUDENT" column included
Victim B.  Ten "income" individuals had the notation "change
status" listed next to their name under the section "status."
The FBI sent the list of the ten individuals, who were under the

---

        [9] Based on my knowledge of this investigation, including
interviews with victim-escapees, I understand that "FTMWS"
stands for "full-time miracle workers."  In addition, from
interviewing victims and reviewing emails obtained through the
Email Search Warrant, I have learned that the term "miracle
workers" refers to members that solicit on behalf of KOJC.

"Change Status" column, to USCIS.  USCIS obtained and reviewed
immigration information on nine of the ten names, and all nine
had applied to change status based on a marriage.

        c.    In an October 11, 2015 email from **ESTOPARE**,
specifically, from Amanda.estopare@kojc.net, with the subject,
"2015 mob plan,"[10] and forwarded to Victim B, **ESTOPARE** was listed
under "Admin Staff," with her specific duty being "Accounting."

        **3.    Victim C**

16.    On or about February 19, 2019, the FBI interviewed
Victim C, who provided the following information:[11]

        a.    He/she started working as a full-time miracle
worker for KOJC in 2010 and moved into the Van Nuys compound
with his/her children.  Upon arriving, they had to give their
passports and identifying documents to someone else.  Workers
had to request access to passports and identifying documents; if
the request was granted, the documents had to be returned by the
end of the day.

        b.    He/she previously worked as a licensed attorney
in the Philippines, and he/she was given a position of trust
early on in his/her time with KOJC.  Specifically, Victim C
handled the marketing of a KOJC paper in the United States
before beginning to work as a driver and group leader of KOJC

---

        [10] From my knowledge of this investigation, interviews with
former members of KOJC, and review of emails obtained from the
Email Search Warrant, I know that KOJC members referred to the
Month of Blessings as the "MOB."

        [11] During this investigation, Victim C was compensated
approximately $1,000 by the FBI on one occasion for providing
information and cooperating with the FBI.

workers, a position in which he/she worked until 2018.  During
this time, he/she worked with KOJC administrators, including
(among others) **DUENAS**.

       c.   KOJC workers were given pamphlets describing CJF
as a charity for children in the Philippines.  Victim C's job at
KOJC was to drive workers around to solicit money.  In this
role, he/she would collect the money, record the amount of money
received, and bring that information back to the Van Nuys
compound or send the information via text message to whoever was
in charge.  **ESTOPARE** was the accounting and financial leader at
the Van Nuys compound, and all money earned was reported to
(among others) **CABACTULAN**.  **CABACTULAN** had an overall leadership
role in the United States.

       d.   Victim C stated that **CABACTULAN** asked him/her if
he/she would give up custody of his/her children.  Victim C did
not give up custody of his/her children, but **CABACTULAN** became
their guardian.  During the Month of Blessings, Victim C and
others were often separated from their children.  Victim C never
spent Christmas with his/her children while working for KOJC.

       e.   Victim C stated that if a KOJC worker proved to
be a good solicitor or earner, the worker would be forced to
apply for a student visa so they could stay in the United States
and continue soliciting.  KOJC was also involved in sham
marriages.  KOJC often forced top earning workers over 18 years
of age to marry United States citizens so they could stay in the
United States and continue soliciting.  Victim C stated that

17

his/her son, who was a United States citizen, was forced to marry a top-earning KOJC worker.

f.   In addition, Victim C stated that after the search of a KOJC plane in Hawaii on February 13, 2018, some changes were made within the organization.[12]  Specifically, a portion of the immigration documents and passports previously stored at the Van Nuys compound were placed at **DUENAS's** office located at an address in Panorama City, California, within the Central District of California.[13]  These documents included green cards, passports, marriage documents, and student visas.

g.   Victim C further stated that **DUENAS** possessed ATM cards to show UCSIS that the couples in the sham marriages have joint banking accounts.  **DUENAS** handles the credit cards of the workers and that she also keeps packages at the Panorama City address that consist of luxury items purchased in the United States at her office, which she sends to the KOJC leader and his pastorals approximately every few months.  These items include

---

[12] Based on my knowledge of this investigation, I know that a KOJC plane was in fact searched in Hawaii in 2018 and that more than $330,000 was found wrapped in socks in a bag containing items reflecting the KOJC leader's name.  The United States Attorney's Office in Hawaii currently has a criminal case against a KOJC administrator arising from that search, in which the government has charged bulk cash smuggling and accessory after the fact.

[13] Based on another witness interview, that is, statements by Victim G (discussed below), I understand that this location in Panorama City is run by **ESTOPARE** and that **DUENAS** keeps passports and identifying documents of KOJC workers at that premises.  In addition, on or about January 3, 2020, I reviewed a rental agreement for the Panorama City premises and learned that **CABACTULAN** has rented it since February 26, 2018, and that her current rental agreement expires on February 29, 2020.

Armani suits for the KOJC leader and lingerie from Victoria
Secret and beauty products for the pastorals.

17.   On or about February 19, 2019 and June 26, 2019,
Victim C sent the FBI certain emails received while working full
time with KOJC, including emails that evidence **ESTOPARE's**
knowledge of KOJC solicitation activity.   For example:

a.   On December 27, 2015, Victim C received an email
from **ESTOPARE**, via Amanda.estopare@kojc.net.   The email had the
subject line "names send thru moneygram."   The email provided
the names of four KOJC workers and their locations in the
Philippines.   Per the email, certain KOJC workers in the United
States were to wire money brought in through fundraising via
"moneygram."

b.   On October 24, 2014, Victim C received an email
from **ESTOPARE**, via Amanda.estopare@kojc.net.   The email had the
subject line "new terms."   The email stated, "here are the new
terms to be used for daily reporting."   The email included a
Word document attachment titled "NEW TERMS," which showed a list
of KOJC workers and their roles.   **ESTOPARE** was listed as "ADMIN
STAFF" with a role of "daily and weekly MOB reports/weekly
payables."

c.   On January 26, 2016, Victim C received an email
from **ESTOPARE**, via Amanda.estopare@kojc.net.   The email had the
subject line "format."   The email included an Excel spreadsheet
for KOJC workers to report their "financial / cash flow report"
from October 23, 2015 through January 30, 2016.

18.   The FBI interviewed Victim C on June 10, 2019.  Victim C provided the following information:

a.   All KOJC workers reported their fundraising totals to their group leader or coordinator, who then reported the totals to **ESTOPARE**.  The reporting to **ESTOPARE** was typically done through text messaging or Facebook messenger.  Similarly, another victim (Victim E, referenced below) stated that **ESTOPARE** kept all the financial information at the Van Nuys compound; if a KOJC worker did not report their finances to **ESTOPARE** on time, **ESTOPARE** would send text messages and pester the KOJC worker until he or she reported.

b.   KOJC workers were given instructions from **ESTOPARE,** via text messages or Facebook messenger, as to what to do with the fundraising money each day.  KOJC workers were often instructed to deposit the cash into accounts and then make money transfers.  **ESTOPARE** would send the names of people to whom the KOJC workers were to transfer the money.

c.   **ESTOPARE** instructed KOJC workers to make cash deposits of less than $9,000, and Victim C believed that this was a way to avoid detection from the banks.  Based on my training and experience, and knowledge of this investigation, I know that banks must report any deposits that they receive over $10,000; accordingly, structuring deposits in the manner reportedly instructed by **ESTOPARE** would have the effect of evading detection by regulators and law enforcement.

19.   On September 24, 2019, Victim C provided the FBI with a printed copy of screenshots from Victim C's phone.  Victim C

stated that all the screenshots were sent via text message, email, and/or Facebook messenger to **ESTOPARE**.  The screenshots consisted of ledgers, bank deposit receipts, wire transfer receipts, reporting spreadsheets, and other bank account information.  Victim C stated that all the screenshots were sent to **ESTOPARE** as part of the daily quota reporting by KOJC workers from the 2016-2018 Month of Blessings.

20.   Victim C told the FBI that he/she believed that most of the money raised by KOJC workers paid for a KOJC project in the Philippines, KOJC operations worldwide, and the KOJC leader's lifestyle.  According to Victim C, barely any of the money raised for CJF went to kids in the Philippines.  Victim C provided a spreadsheet titled "2018 USA Overall FR Goal," which he/she obtained from **ESTOPARE** when Victim C was still part of KOJC.  Victim C described the spreadsheet as reflecting fundraising goals for KOJC workers at each KLC for the year 2018.  The spreadsheet showed the goals for the KLCs in the United States and Central America.  The goals were divided into the following categories:  "Kingdome," "Weekly Multimedia," "Tribute/ICD," "IYC Registration," "IKLC Registration," and "Total."  Victim C further described each category as follows:

a.   The "Kingdome" column pertains to fundraising to help build a stadium called the "Kingdome" in the Philippines.

b.   The "Weekly Multimedia" column reflects a fundraising goal set by the various multimedia groups within KOJC, such as a television program and newspaper.

c.    The "Tribute/ICD" column pertains to fundraising where funds are provided directly to the KOJC leader as a gift on his birthday.  Victim C stated that many KOJC workers compete to raise the most funds as a tribute to the KOJC leader.

d.    The "IYC [International Youth Convention] Registration" column pertains to fundraising to send KOJC youth to the annual youth convention in Davao.

e.    The "IKLC [International Kingdom Leadership Conference] Registration" column pertains to fundraising to send KOJC leaders of each KLC to the annual leadership conference in Davao.

f.    The spreadsheet shows a "Total" monthly fundraising goal of $802,000.00 to be raised by KOJC workers at KLC locations in the United States and Central America.

g.    There is no indication on the spreadsheet that any of the fundraising money is to go to CJF or needy children.

21.    On January 22, 2020, the FBI interviewed Victim C, who provided the following information:

a.    **ESTOPARE** was the accounting and financial leader at the Van Nuys compound.  After the MOB, KOJC announced new assignments and appointments through email.  **ESTOPARE** was named the accounting and financial leader every year.  In 2013, **ESTOPARE** replaced **CABACTULAN** as the accounting and financial leader.

b.    From the end of 2016 until Victim C left KOJC in 2018, Victim C assisted **ESTOPARE** with KOJC finances.  Victim C assisted **ESTOPARE** with counting money, buying socks, and rolling

22

the money into socks for the KOJC workers who would be flying
back to the Philippines.  During this time, on Mondays, Victim C
made cash deposits at local banks and exchanged smaller bills
for crisp $100 bills, as directed by **ESTOPARE.**

### 4.  Victim D

22.  On or about October 20, 2019, FBI agents interviewed
Victim D, who provided the following information:[14]

a.  Victim D was a former KOJC member who was also a
pastoral.  She was sent from the Philippines to the United
States in 2014 to help with the Month of Blessings.  During the
MOB, KOJC workers were divided into assigned groups and areas to
fundraise.  Each group typically had a driver and a leader, who
was responsible for reporting the money that the group raised
each day.  Victim D stated that **ESTOPARE** was in charge of the
money and financial reporting in the United States during the
MOB.

b.  KOJC workers often slept in their car overnight,
parked at truck stops, or occasionally stayed in a small hotel
room.  KOJC workers were expected to work as many hours as
needed in order to reach their daily goals, which were provided
by **ESTOPARE.**

c.  When returning back to the Philippines, every
KOJC worker typically brought back undeclared cash hidden in
socks and clothing within their luggage, as directed by KOJC
leadership, including **ESTOPARE.**

---

[14] Victim D received continued presence relief on December
31, 2019, which expires on December 30, 2021.  Victim D received
continued presence from USCIS with FBI coordination.

d.    The cash solicited during the MOB in 2017 was collected at a KOJC mansion in Calabasas, California, within the Central District of California.  According to Victim D, **DUENAS** (and another KOJC administrator) later brought even more bags of money to the mansion.  Based on my knowledge of this investigation, including my review of mortgage records and interviews of victim-escapees, I know that the Calabasas mansion is owned by a KOJC administrator and that the KOJC leader stays at the mansion when he comes to California.

e.    **CABACTULAN** was the lead KOJC administrator in the United States, in charge of both **DUENAS** and **ESTOPARE**.

### 5.   Victim E

23.   On or about November 20, 2019, the FBI interviewed Victim E, who was previously identified by others victims (i.e., Victim L and Victim M) as the collector of money across the United States.  Victim E provided the following information:[15]

a.    He was born in the Philippines and joined KOJC with his family in 1997 when he was approximately 11 years old. He left KOJC in or around November 2019.

b.    In 2004, Victim E graduated high school and became a full-time KOJC worker, fundraising full time and residing at the Van Nuys compound.  KOJC did a lot of their fundraising during the month of December, which was referred to as the Month of Blessings, and would bring in KOJC workers from the Philippines on R-1 (temporary nonimmigrant religious worker)

_____

[15] Victim E has not received any benefits of which I am aware.

visas to solicit money.  After the Month of Blessings, most of
the KOJC workers then returned to the Philippines.

      c.   Victim E believed the money solicited went to
fund the KOJC leader's lifestyle in the Philippines or to
establish and maintain KOJC properties in the United States and
the Philippines, and not to help poor children in the
Philippines.  Victim E stated that there were no programs or
events set up through CJF for children so KOJC started doing
public things to "show" that CJF and KOJC were doing things to
help children.  Victim E believed that most fundraising now was
going to fund the "Kingdome" at the KOJC compound in Davao,
which he has seen and which is currently under construction.
Victim E also believed that the money was going to fund the
planes and helicopters that KOJC had in the Philippines, which
Victim E had also seen.

      d.   At least since in or around 2014, **DUENAS** was in
charge of the documents, visas, passports, and marriages of the
KOJC workers.  **DUENAS** collected the passports of the KOJC
workers and kept them in her office.  **DUENAS's** office used to be
in the Van Nuys compound, but Victim E now believed that **DUENAS**
had a new office at another location nearby.  Victim E stated
that if a KOJC worker needed their documents for something
legal, they had to make a request and the KOJC leadership,
including **DUENAS,** had to go with them to the location where the
KOJC workers needed to use the documents.

      e.   Beginning in 2007, KOJC found new ways to have
KOJC workers stay in the United States because they could make

more money soliciting in the United States than in the Philippines.  KOJC started arranging marriages of KOJC workers to members who were United States citizens so they could stay and solicit money in the United States full time.

       f.  In 2008, Victim E, a United States citizen, was married to another KOJC worker.  They were married at a wedding chapel in Las Vegas, Nevada at the same time as other arranged KOJC marriages.  Victim E stated that the marriage was strictly to obtain citizenship for the other KOJC worker as there was no romance between them and they did not live together.  Victim E stated that the KOJC worker that he married was a pastoral, and that pastorals were only for the KOJC leader, who made sure that no other male workers talked to them or got close to them.[16] According to Victim E, KOJC workers who got close to or had a relationship with a pastoral would be subject to punishment, including hard labor and paddling.

       g.  Victim E stated that in 2014, KOJC leadership, including **DUENAS**, commenced divorce proceedings for Victim E with respect to the above-referenced KOJC worker, without Victim E's knowledge.  Victim E was then told he was to marry a different KOJC worker.  Victim E met his future spouse at a residence in Ohio to conduct the marriage interview process and file the paperwork.  Victim E was instructed to lie regarding this new marriage by **DUENAS** and **CABACTULAN**, i.e., to lie about

---

[16] According to Victim A, as well as other victim-escapees whom the FBI interviewed, including Victim L and Victim M, in addition to acting as the KOJC leader's personal assistants, pastorals were obligated to perform "night duty," i.e., have sex with the KOJC leader.

being in a true romantic relationship and about living together.
Victim E and the KOJC worker got married in an office in Ohio at
the direction of KOJC leadership, including **DUENAS**.

### 6.   Victim F

24.   On or about November 20, 2019, FBI agents interviewed
Victim F; who provided the following information:[17]

a.   Victim F joined KOJC in approximately 2004 and
left in or around November 2019.  KOJC workers solicited money
on the streets and in many locations, including malls, colleges,
restaurants, Walmart, and Home Depot.  KOJC workers typically
solicited in groups and each group had a "Financial in Charge"
that counted the money collected by the group each day.  After
the money was counted, the Financial in Charge sent a daily
report to **ESTOPARE**.  **ESTOPARE** then sent the reports to KOJC
administrators in the Philippines who reported directly to the
KOJC leader.

b.   Based on Victim F's personal experience as a
driver for KOJC, as well as Victim F's knowledge of **ESTOPARE's**
role in KOJC as being in charge of the money, Victim F believed
that **ESTOPARE** likely drove the money from the Van Nuys compound
to the mansion in Calabasas, California after the Month of
Blessings.

c.   Some KOJC workers from the Philippines, who
arrive in the United States on a B1/B2 (business and tourist)
visa, are married off so they can attempt to obtain United

---

[17] Victim F has not received any benefits of which I am
aware.

States citizenship.  KOJC administrators decide who will marry whom and pass this information onto the KOJC coordinators. Workers marry whomever they are told to marry because it is "the father's will."

  d. Victim F did not know the name of the lawyer(s) who assisted with the marriages, but based on Victim F's involvement in KOJC, as well as his own experience being forced to enter a fraudulent marriage, the paperwork was handled by **DUENAS**, who is based at the Van Nuys compound.  Victim F stated that **DUENAS** travels to various states to handle the marriages if needed.  Victim F further stated that **CABACTULAN** handled the paperwork for marriages before **DUENAS**.

  e. Victim F, a United States citizen, married another KOJC worker in 2013 at the direction of KOJC.  After they were married, they were always assigned to work in the same state when they were in the United States; however, they were not always in the same state and never stayed in the same room. Victim F's spouse was a Filipino citizen and married Victim F so she could get United States citizenship.

  **7. Victim G**

25. On or about March 14, 2019, the FBI interviewed Victim G after he submitted a tip to the FBI Public Access Line.  Victim G provided the following information:[18]

---

  [18] Victim G has not received any benefits of which I am aware.

a.    He joined KOJC in 2010 at the age of 12 and
solicited on behalf of KOJC.  He left KOJC in approximately May
or June 2018.

b.    Upon arrival at the Van Nuys compound, all
identifying documents, such as green cards and passports, were
given to the KOJC leadership.  The passports and identifying
documents were held secure in the office at the compound.
**ESTOPARE** ran the office, and **DUENAS** kept the passports and
identifying documents of KOJC workers.  KOJC workers had to have
a reason and apply to get access to their passports and
identifying documents.

c.    Most of the fundraising was done by KOJC workers
asking people for money or singing in public places.  Each KOJC
worker had a monetary quota that they were to raise each day.
Victim G was forced to raise funds during high school.  He and
any other KOJC workers who attended school outside KOJC were
typically dropped off and picked up by a KOJC worker.  He raised
funds almost every day after school from 3:00 p.m. until
approximately 9:00 p.m. **ESTOPARE** was one of the main treasurers
who lived at the Van Nuys compound and decided what the KOJC
workers were to do with the money brought in through
fundraising.

d.    KOJC workers had to solicit money nearly every
day.  KOJC workers solicited by "fundraising" for CJF, which was
described as a charity to support children in the Philippines.
Victim G stated that barely any of the money raised for CJF went
to children in the Philippines.  Victim G believed that most of

the money raised went toward building the "Kingdome" in the Philippines and funding the KOJC leader's lifestyle.  Victim G stated that the fundraising quotas required by KOJC workers had increased since 2013 because the KOJC leader wanted to build the Kingdome in the Philippines.  The Kingdome was to be finished in 2015 but was still under construction.

### 8.   Victim H

26.   On November 20, 2019, the FBI interviewed Victim H, who provided the following information:[19]

a.   Victim H joined KOJC with her family in 1989 when she was five years old.  She began fundraising and soliciting money for KOJC when she was 12 years old.  She left KOJC in or around November 2019.

b.   In 2013, she was first sent to the United States to fundraise as part of the MOB.  Whenever she came to the United States for KOJC, she and all the other KOJC workers had to turn in their passports to the administrative staff at the Van Nuys compound, which included **DUENAS** and **ESTOPARE**.  The passports and identifying documents were kept at the office and were given to workers only as needed.  Victim H was not able to freely access her documents.

c.   Each fundraising group of KOJC workers in the United States was assigned a daily fundraising quota.  The daily quotas were assigned by the leaders of each KLC group, who were

---

[19] Victim H is in the process to receive continued presence. Victim H has also received housing from a non-governmental organization.

assigned by **ESTOPARE**; **ESTOPARE** was the KOJC financial leader in the United States.

        d.   KOJC workers were instructed by **ESTOPARE** and the administrative staff where to deposit the money brought in through fundraising.  KOJC workers were often instructed to wire money from one bank account to another, or to send money via MoneyGram and/or Western Union, as instructed by **ESTOPARE** or the administrative staff.

        e.   KOJC workers who did not make their daily quotas were verbally yelled at and emotionally abused.  Aside from two weeks out of the year, Victim H never had a day off from fundraising and was forced to fundraise almost every day, seven days a week.  She was never paid by **ESTOPARE** or KOJC for fundraising or for any other obligations that she undertook on KOJC's behalf.

        f.   In 2016, **DUENAS** applied for a student visa on Victim H's behalf and enrolled her as a student at a university in California.  Two years later, Victim H was enrolled at a different university in California.  Victim H stated that classes were typically one day a week from 9:30 a.m. until 7:00 p.m., and that there were approximately 20 KOJC workers enrolled at the latter university.  Victim H stated that she was forced to attend class, and the group was driven by another KOJC worker who was also a student.  **DUENAS** was in charge of applying for the student visas of KOJC workers and enrolling them into universities.  Victim H believed this was used as another way for KOJC to keep workers in the United States soliciting year-

31

round.  Victim H believed that KOJC used these two universities because of their lenient attendance policies, consisting of one class per week or twice per month.  When Victim H was not attending class, she was forced to fundraise and solicit for KOJC.  The above-referenced universities did not have class during the winter holidays, which was during the Month of Blessings, so many of the students could fundraise full time all across the country during that time.  Based on a discussion with another law enforcement agent specializing in immigration law, I understand that individuals who hold student visas and are currently in school (i.e., they have not graduated) are generally not allowed to work.

### 9. Victim I

27.  On or about November 12, 2019, the FBI interviewed Victim I, who provided the following information:

a.  Victim I had been a life-long member of KOJC and worked for KOJC in various capacities.[20]  Most recently, Victim I worked as an attorney for KOJC in the Philippines.  Victim I provided the names of several individuals who might have information regarding KOJC's finances, including a former banker for KOJC who left the organization in 2019.  This former banker emailed Victim I information about KOJC's Philippine and international bank accounts, which Victim I then provided to the FBI.

---

[20] On January 21, 2020, Victim I received continued presence relief, with the assistance of the FBI, which expires on or about January 20, 2022.  Victim I also received temporary housing through a non-governmental organization, which Victim I obtained on her own accord, on November 21, 2019.

b.    Among the documents from the former banker was an
Excel spreadsheet documenting "remittance" from various
countries, as well as wire transfer information, including the
amount, sender, and recipient.  According to this spreadsheet,
on December 6, 2017, **CABACTULAN** transferred $10,985 earned by
"Amanda's Team" to "The Executive Pastor," and the transaction
was marked as "claimed."  On February 8, 2018, **CABACTULAN**
transferred $15,000 earned by "Amanda's Team" to "The Executive
Pastor," but the transaction was not marked as "claimed."

i.    Based on my training and experience and
knowledge of this investigation, I believe that $10,985 earned
by "Amanda's Team" refers to the amount of funds raised, through
begging and other solicitation activity, by KOJC workers on a
certain team; I also believe that when this money is transferred
to "The Executive Pastor," it is sent to the KOJC leader, as
opposed to the nonprofit CJF in order to help in-need children.
Based on my training and experience and knowledge of this
investigation, I understand that "claimed" means that the
recipient of the transaction -- "The Executive Pastor" --
obtained the sent funds.

### 10.  Victim J

28.   On October 7, 2019, the FBI interviewed Victim J, a
former KOJC worker who fled the organization in or around October
2019.  Victim J provided the following information:[21]

---

[21] Victim J received continued presence relief on January
13, 2020, which expires on January 12, 2022.  Victim J received
such relief from USCIS with FBI coordination.

a.   Victim J started working full time with KOJC in 2002 while studying in Singapore.

b.   The more intensive fundraising by KOJC workers in the United States was during the MOB.

c.   From 2015-2017, **ESTOPARE** had personally given him between $8,000-$9,000 cash to carry each time he flew back to the Philippines.  **ESTOPARE** gave KOJC workers nearly $9,000 each, in undeclared cash, to carry in their luggage when flying back to the Philippines.

d.   Victim J believed that all the money raised by KOJC workers went to KOJC in Davao, and not to CJF or in-need children.  Victim J stated that after the KOJC leader obtained his own aircraft, the KOJC leader decided he wanted more money. In 2010 or 2011, fundraising activities increased, and daily quotas were raised so the KOJC leader could buy a brand new private jet.  Because the fundraising was going so well in 2011, KOJC leaders decided it should continue.  KOJC began building a stadium (the "Kingdome") and bought luxury cars, which were to be used by the KOJC leader inside his compound in Davao -- all of which Victim J has personally seen.  According to Victim J, the KOJC leader had a Mercedes and a Bentley shipped to Davao from the United States, and bought a bullet proof Cadillac Escalade and other bullet proof vehicles.  Victim J has seen these luxury items as well.

//

//

34

**E.    Further Evidence of a Conspiracy to Commit Immigration Fraud**

29.   As documented in a report, which I have reviewed, on or about March 20, 2018, officers from USCIS visited an address at 3506 Sewells Point Road, Norfolk, Virginia in order to investigate the marriage of two persons (hereinafter referred to as "Person 1" and "Person 2") following Person 1's application for lawful permanent residence status.  During the course of their investigation, USCIS observed the following:

a.   During the interview of Person 1 and Person 2, they stated that they lived with a third person ("Person 3") and another person, who I believe to be, based on the name, Victim F, referenced above.

b.   As detailed in their report, while at the subjects' residence, the officers were shown around the house by the landlord.  When asked about Person 3 and Victim F, the landlord told the officers that they had moved to Van Nuys, California the previous year and that they had told her "to tell that to CIS" if they inquire.  The officers observed bunk beds in the residence and, when questioned about them, the landlord stated that she had bunk beds in the room because "they were church beds before."  The officers noted a poster for CJF and two large photographs of the KOJC leader in the residence.  Eventually, the landlord admitted to the officers that Person 1 and Person 2 did not live with her at the Sewells Point Road address, but rather lived at the church.

c.    During the inspection, the officers encountered
mail addressed to a fourth person ("Person 4") at the residence,
and the landlord stated that Person 4 was "in charge" and was
the "coordinator" at the church.[22]   The landlord said that Person
4 was married to a woman ("Person 5") who lived in California
while Person 4 lived in Virginia.   Person 2 later stated during
the investigation that he did not think that Person 4 was
married.   Based on my training and experience, and involvement
in this investigation, I believe that Person 2's statement that
he did not think that Person 4 was married is based on the fact
that KOJC members did not openly discuss marriage with other
KOJC members.   I understand that this was so because KOJC
workers often viewed marriage as an arrangement dictated by KOJC
leadership, a transaction not rooted in romance but in "the
father's will."

d.    Record checks revealed that Person 4 was married
to Person 5, who worked for CJF in Glendale, California.   During
the investigation, USCIS informed the FBI that Person 4 had a
pending I-751, Petition to Remove Conditions on Residence, that
was filed in Fresno, California, and that he had applied for a
permanent green card based on his marriage to Person 5.

e.    According to USCIS's report, during the interview
of Person 1 by USCIS, which occurred in Virginia at the
premises, conducted after she applied for lawful permanent

---

[22] A review of the Virginia Business Database revealed that,
as of December 29, 2017, Person 4 was the registered agent for
"The Kingdom of Jesus Christ, Tnaen Virginia Inc."

36

residence status, Person 1 stated that neither she nor her husband worked, and that she was not volunteering anywhere.

      f.   According to USCIS's report, during Person 2's USCIS interview, which occurred at a KOJC church in Norfolk, Virginia, he admitted that he actually stayed at the KOJC church on a folding bed, and that he had spent the past four months there.  When the officers asked to see where he slept, the officers observed evidence of multiple people living there.  At one point, the officer could hear a baby cry from behind a locked door.  The occupants refused to open the door and Person 2 was evasive about the number of beds that were inside.

      g.   During the interview of Person 2 by USCIS, he stated that **DUENAS** helped Person 2 and his wife with immigration paperwork, telling the officers that "[**DUENAS**] gave us ideas for the paperwork."  He stated that **DUENAS** was merely a member of KOJC and did not work for the church and that she was located at the Van Nuys KOJC church, located at the Van Nuys compound.

      i.   Based on my conversations with USCIS Immigration Officer Levon Arslanian, who reviewed immigration records of known KOJC members, between March 19, 1999 and December 5, 2019, 82 marriages were entered by KOJC administrators and full-time solicitors.

   30.   In addition, based on my review of a Townson University (Maryland) Police Department report, I know that on June 30, 2018, Towson University Police Department responded to a report of possible "charity scammers soliciting donations."  The complainant stated that he was approached by two solicitors, who

asked for donations on behalf of CJF.  A Townson University
Police Department officer approached them, and they provided the
officer with brochures and identification cards issued by CJF,
showing an address in Glendale, California, within the Central
District of California.  Neither solicitor had any other
identification on them.  The officer called the number on the
card and spoke with **ESTOPARE,** who stated that she worked for CJF.
**ESTOPARE** stated that the charity helped poor children, and that
she was familiar with the two solicitors.

31.  According to United States immigration records
reviewed by USCIS, one of the solicitors was issued a B1/B2
(business and tourist) visa on October 8, 2013 to be a violinist
on a three-month tour -- not to solicit money on the streets.
She listed the Van Nuys compound as her United States address.
She entered as part of a group of seven individuals.  She was
admitted to the United States with a return date of March 28,
2016, meaning that she was not in the United States with legal
immigration status on the date of her interaction with Towson
police.

32.  Beyond the emails described above, other emails from
the Email Search Warrant show **CABACTULAN's, DUENAS's,** and
**ESTOPARE's** involvement in a conspiracy to commit immigration
fraud.  For example:

a.  In an email, which I have reviewed, dated October
24, 2015 from a KOJC worker to **ESTOPARE,** subject line,
"RosefRO2310," and forwarded to Victim B, the worker wrote in
the body of her letter:

Te [elder sister], yesterday we were not sure of the
area so I have them accompanied the newbies to show
them the ways on how to harvest indoor and outdoor
especially in Walmart, market and to enter the resto
[sic] some of them were already experience in asking
donations but still a little nervous.

       i.   Based on my training and experience and

knowledge of this investigation, I believe this email describes

new KOJC solicitors being trained on how to solicit on behalf of

KOJC at Walmart and other locations.

       b.   The author of the above email continued her email

to **ESTOPARE** by analyzing how each person in her group did during

their "harvest," noting that a certain worker "is still

adjusting, seems like she is not used to indoor harvest and

[another worker] taught her how to approach the Spanish and

other race at walmart [sic]."  With regard to two other

solicitors, the email's author wrote to the administrators that

"ptf (praise the father) Te (elder sister) they went together to

the mall.  [A worker] did good, have potential to reach the

daily goal of 1000.  Just need a little coaching to be a little

faster.  Bless the father, have the nerves to approach different

races."  She ended the letter by telling the administrators that

"as of now we are still in Utah.  We drop them early so we can

reach our goal before nighttime."

       i.   Based on my training and experience and

knowledge of this investigation, I believe that the author of

the email is informing KOJC administrators on how new solicitors

are performing, including whether they have the potential to

reach a daily solicitation quota of $1,000.

33.   In an email dated October 24, 2015 from a KOJC worker to (among others) **ESTOPARE** -- "Amanda Estopare" (Amanda.estopare@kojc.net) -- with the subject line, "OCTOBER230215FR," the author of the email provided a tally of how much her group of solicitors raised on October 23, 2015, listing the total for the day as $2,777, with a net income of $2,407 after expenses.[23]  The email's author was listed as the top earner with $701.  In her summary, the author stated, "we traveled to our area in Minneapolis where we are claiming miracles and abundant Blessings in our harvest."

34.   In addition, I have reviewed an email obtained from the Email Search Warrant, dated October 11, 2015, with the subject "2015 mob plan," and forwarded to Victim B.  In the email, **CABACTULAN** was noted as being in charge of the "Northern Command" of the "KLC's" "Full Time Workers and Members."

35.   The FBI further obtained an email from the Email Search Warrant, dated September 25, 2014, from **DUENAS** to other KOJC administrators, in which **DUENAS** tells the United States KOJC coordinators the following:  "[A]ttached herewith is the list of FTW's [full time workers] bound to USA via LAX and SF and List of

---

[23] The email does not specify that the amounts are in dollars, but the email does state that the group was in "Minneapolis."  Further, the email was written in coded language.  For example, AIO followed by a name is code to signify the person is on a certain team.  Sierra team espresso is code for the team's expenses, manna is code for food, dmanna is code for driver's food, cp+load is code for cellphone bill, and toll espresso is code for total expenses.  Based on the context of the email, my knowledge of this investigations, and conversations with Victim B, who received the email, I believe the above information accurately reflects the content of the email.

FTW's bound USA via JFK New York.  I already sent to the tickets for FTW's via LAX and SF to [names omitted]. . . We will also send u later a series of probable questions and answers; just in case they will be ask by the immigration officer upon entry. Their answers must coincide with the office, just in case we receive an inquiry or call.  We are finishing it now because Ate Guia (**CABACTULAN**) will be answering the phone."

        a.    Based on my training and experience, and knowledge of this investigation, when **DUENAS** states that "[w]e will also send u later a series of probable questions and answers," I believe **DUENAS** and her co-conspirators, including (per the email, **CABACTULAN**) coached KOJC workers on how to answer questions from immigration authorities in order to avoid detection.  In addition, when **DUENAS** states, "Their answers must coincide with the office," I believe **DUENAS** is attempting to manufacture a uniform response vis-à-vis **CABACTULAN** -- who "will be answering the phone" -- to thwart immigration and law enforcement efforts.  Based on my training and experience, and knowledge of this investigation, such tactics are used by immigration-law offenders, including human traffickers.

//

//

## IV. <u>CONCLUSION</u>

36.    For all the reasons described above, there is probable cause to believe that **CABACTULAN, DUENAS,** and **ESTOPARE** have conspired to commit immigration fraud, in violation of Title 18, United States Code, Section 371.

ANNE M. WETZEL
Special Agent, Federal Bureau
of Investigation

Subscribed to and sworn
before me this 27 day of
January 2020.

HONORABLE AUTUMN D. SPAETH
UNITED STATES MAGISTRATE JUDGE