COPY

FILED
2020 FEB 12 PM 4:39
CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
SANTA ANA
BY_____

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

September 2019 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br>　　　　v.<br><br>GUIA CABACTULAN,<br>MARISSA DUENAS, and<br>AMANDA ESTOPARE,<br><br>　　　　Defendants. | No. LA CR 20-00079-TJH<br><br>I N D I C T M E N T<br><br>[18 U.S.C. § 371: Conspiracy; 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c): Criminal Forfeiture] |

The Grand Jury charges:

INTRODUCTORY ALLEGATIONS

At times relevant to this Indictment:

A.　THE ORGANIZATIONS

　　1.　The Kingdom of Jesus Christ, The Name Above Every Name ("KOJC") was a church that was founded on or about September 1, 1985 in Davao, Philippines. KOJC claimed to have approximately six million members in approximately 200 countries.

　　2.　In or around 1998, KOJC developed the Children's Joy Foundation ("CJF"). According to the website https://cjfusa.org/about/, CJF was "a nonprofit organization helping

children around the world through school sponsorships, feeding and housing programs."

3. According to information filed with the Internal Revenue Service, in or around 2007, KOJC began operating CJF in the United States as a registered non-profit charity under Title 26, United States Code, Section 501(c)(3). CJF was registered in the state of California as a foreign non-profit with its principal office located at 127 South Brand Boulevard, Glendale, California 91204.

4. KOJC owned and operated the property that included its church and main office within the United States, located at the 14400 block of Vanowen Street, Van Nuys, California 91405 ("KOJC Compound"). KOJC also maintained an office located at 14500 Roscoe Boulevard, Fourth Floor, Office #20, Panorama City, California 91402 and a storage unit located at 6900 Van Nuys Boulevard, Unit 3103, Van Nuys, California 91405.

5. Inside the KOJC Compound was an office operated by KOJC administrators, including defendants GUIA CABACTULAN, MARISSA DUENAS, and AMANDA ESTOPARE (collectively the "defendants").

B.  THE DEFENDANTS

6. The defendants were the main KOJC administrators in the United States and were in charge of organizing the solicitation activities of KOJC workers in the United States. The defendants lived and worked at the KOJC Compound, where they held the following responsibilities for KOJC:

   a. Defendant CABACTULAN was the lead KOJC administrator in the United States and, along with other KOJC administrators located in the Philippines, directed the activities of both defendants DUENAS and ESTOPARE. Defendant CABACTULAN operated the

KOJC Compound and maintained direct communication with KOJC leadership in the Philippines. Defendant CABACTULAN was previously in charge of tracking and reporting the money raised by KOJC workers in the United States to KOJC administrators located in the Philippines until in or around 2015, when defendant ESTOPARE took over this role for her.

   b. Defendant DUENAS was the human resources leader of KOJC in the United States and was responsible for collecting and securing the passports and immigration-related documents from KOJC workers in order to prevent KOJC workers from freely accessing their passports and immigration-related documents. Defendant DUENAS also handled fraudulent immigration-related documents for KOJC workers, including applying for sham marriages and student visas obtained on behalf of KOJC workers in order to allow the workers to remain in the United States to solicit on behalf of KOJC.

   c. Defendant ESTOPARE was in charge of tracking and reporting the money raised by KOJC workers in the United States to KOJC administrators located in the Philippines. Defendant ESTOPARE provided daily solicitation quotas for KOJC workers to meet and would direct the flow of solicited funds from the United States to KOJC administrators in the Philippines.

C. <u>NONIMMIGRANT VISAS</u>

  7. A citizen of a foreign country who wished to enter the United States generally was required to first obtain a visa from the United States Government: either a nonimmigrant visa for temporary stay, or an immigrant visa for permanent residence. Visitor visas were nonimmigrant visas for persons who wanted to enter the United States temporarily for business (visa category B-1), for tourism,

3

pleasure, or visiting (B-2), for both purposes (B-1/B-2), or to attend school in the United States (F or M). An individual in the United States on a visitor visa (B-1/B-2) was not permitted to accept employment or work in the United States.

8. In order to apply for a nonimmigrant business and/or tourist visa, an applicant was required to complete and submit a Nonimmigrant Visa Application and schedule an appointment for a visa interview. Generally, the visa interview would take place at a United States Embassy/Consulate in a foreign country.

9. In order to apply for a student visa, an applicant was required to have a foreign residence and must intend to return to that residence upon completion of his or her studies. While on a student visa, the student was required to study at the academic institution through which the visa was granted. In general, student visa holders were allowed to hold off-campus employment only if the employment was related to his or her area of study and was approved by United States Customs and Immigration Services.

10. Receiving a nonimmigrant visa from the United States Government was a privilege, not a right. In order to be granted a nonimmigrant visa to visit the United States, applicants were required to overcome the presumption in the United States Immigration and Nationality Act that all visa applicants are immigrants who intend to remain in the United States.

11. These Introductory Allegations are incorporated into the sole count of this Indictment.

[18 U.S.C. § 371]

[ALL DEFENDANTS]

A. OBJECTS OF THE CONSPIRACY

12. Beginning on a date unknown, but no later than in or around May 2010, and continuing to on or about January 29, 2020, in Los Angeles County, within the Central District of California, and elsewhere, defendants GUIA CABACTULAN, MARISSA DUENAS, and AMANDA ESTOPARE, and others known and unknown to the Grand Jury, conspired with each other to knowingly and intentionally commit offenses against the United States, namely:

    a. Trafficking with Respect to Forced Labor, in violation of Title 18, United States Code, Section 1590(a);

    b. Document Servitude, in violation of Title 18, United States Code, Section 1592(a)(3);

    c. Immigration Fraud, in violation of Title 18, United States Code, Section 1546(a); and

    d. Marriage Fraud, in violation of Title 8, United States Code, Section 1325(c).

B. MEANS BY WHICH THE OBJECTS OF THE CONSPIRACY WERE TO BE ACCOMPLISHED

13. The objects of the conspiracy were to be accomplished, in substance, as follows:

    a. Defendants CABACTULAN, DUENAS, and ESTOPARE, and others known and unknown to the Grand Jury, would knowingly recruit, harbor, and obtain KOJC workers for labor and services by concealing, removing, confiscating, and possessing the passports and other immigration and identification documents, of such KOJC workers.

    b. Defendants CABACTULAN, DUENAS, and ESTOPARE, and

others known and unknown to the Grand Jury, would do so to prevent and restrict, and attempt to prevent and restrict, without lawful authority, KOJC workers' liberty to move and travel in order to maintain the labor and services of KOJC workers, some of whom were and had been a victim of a severe form of trafficking in persons through fraud and coercion for the purpose of subjection to involuntary servitude and peonage, as defined in Section 103 of the Trafficking Victims Protection Act of 2000.

  c. Defendants CABACTULAN, DUENAS, and ESTOPARE, and others known and unknown to the Grand Jury, would coordinate to have KOJC workers, who were previously recruited as KOJC members from the Philippines, admitted into the United States by obtaining United States nonimmigrant visas under false pretenses. Specifically, defendants CABACTULAN, DUENAS, and ESTOPARE, and others known and unknown to the Grand Jury, would instruct KOJC workers to state to immigration authorities and in immigration-related documents that they were traveling to the United States to perform in church-related concerts, when in fact, the primary purpose of the travel to the United States was for KOJC workers to beg for and solicit donations across the country under the guise of being CJF "volunteers."

  d. Defendants CABACTULAN and DUENAS, and others known and unknown to the Grand Jury, would provide KOJC workers with prepared responses and letters to provide to immigration authorities upon arrival into the United States in an effort to avoid detection. The prepared responses and letters stated, in substance, that the KOJC workers would be performing as vocalists or instrumentalists at KOJC concerts, and did not reference soliciting on behalf of KOJC. At the time KOJC workers received the prepared responses and letters, some

of the KOJC workers were aware that their purpose for entering into the United States was to solicit on behalf of KOJC, while other KOJC workers were unaware of the actual purpose until they were forced by defendants CABACTULAN, DUENAS, and ESTOPARE to solicit on the streets nearly every day, year-round, working very long hours, and often sleeping in cars overnight, without normal access to over-the-counter medicine or even clothes.

   e. Once KOJC workers arrived in the United States, defendants CABACTULAN and DUENAS, and others known and unknown to the Grand Jury, would confiscate the passports and other immigration-related documentation from them and store the documents at, among other locations, the KOJC Compound. KOJC workers were allowed to access their immigration-related documents only if traveling on behalf of KOJC or if KOJC workers provided a justification for needing their immigration-related documents that defendants CABACTULAN and DUENAS, and others known and unknown to the Grand Jury, found acceptable. Defendants CABACTULAN, DUENAS, and ESTOPARE, and others known and unknown to the Grand Jury, would confiscate all forms of identification from each KOJC worker and provide the KOJC worker with a badge that identified the worker as a "volunteer" with CJF.

   f. Defendants CABACTULAN, DUENAS, and ESTOPARE, and others known and unknown to the Grand Jury, would transport KOJC workers across the country to solicit donations as CJF "volunteers." These "volunteers" were referred to as Full Time Workers, or "FTWs." KOJC workers fundraised on behalf of KOJC nearly every day, year-round, working very long hours, and often sleeping in cars overnight, despite many of the KOJC workers being prohibited from doing so by

the terms and conditions of their visas.

g.   Defendants CABACTULAN, DUENAS, and ESTOPARE arranged for KOJC workers to be housed in communal living conditions at the KOJC Compound and in other locations across the United States, with multiple KOJC workers housed in shared rooms and under poor conditions.

h.   Defendants CABACTULAN, DUENAS, and ESTOPARE, and others known and unknown to the Grand Jury, instructed KOJC workers to solicit on behalf of CJF, but not to mention KOJC. Defendants CABACTULAN, DUENAS, and ESTOPARE, and others known and unknown to the Grand Jury, provided KOJC workers with CJF pamphlets, and instructed KOJC workers to falsely inform the public that the money was used to aid impoverished Filipino children.

i.   Defendants CABACTULAN and ESTOPARE, and others known and unknown to the Grand Jury, would set daily cash solicitation quotas for KOJC workers. These daily quotas were increased during the months of September/October through January/February of the following year for a period referred to as the Month of Blessings or MOB. KOJC workers who failed to meet their daily solicitation quota were often punished by KOJC administrators, including defendant ESTOPARE, by being yelled at, shamed, berated, physically abused, or forced to fast, i.e., abstain from food, while being locked in a room at the KOJC Compound. KOJC workers in the United States would be organized into fundraising groups across the United States. While soliciting, any expenses, such as food, lodging, and medical expenses, came out of the group's fundraising quota for that day. For that reason, KOJC workers often skipped meals and slept in their vehicles while fundraising on behalf of KOJC.

j. KOJC workers reported their fundraising totals to their group leader, who then reported the totals to defendant ESTOPARE through text message, Facebook, or other means of communication. Defendant ESTOPARE would also receive updates from group leaders on the performance of individual KOJC workers and steps that were being taken for KOJC workers to meet their solicitation quotas.

k. Defendant ESTOPARE provided instructions via text message, Facebook, or other means of communication, regarding what to do with the solicited money collected each day. Defendant ESTOPARE would often instruct KOJC workers to deposit the cash into accounts and then wire transfer the money to other KOJC workers located in the Philippines who were designated to receive the money by KOJC administrators.

l. Defendants CABACTULAN, DUENAS, and ESTOPARE, and others known and unknown to the Grand Jury, would seek to maintain United States immigration status for KOJC workers who proved capable of meeting the cash solicitation quotas by obtaining student visas for such KOJC workers, or by arranging for such KOJC workers to enter into sham marriages with other KOJC workers who had already obtained United States citizenship, for the purpose of evading the immigration laws.

m. Defendants CABACTULAN and DUENAS arranged for KOJC workers who entered into such fraudulent marriages to then apply for United States legal permanent residence status and citizenship based on the fraudulent marriages. Defendants CABACTULAN and DUENAS completed and filed fraudulent marriage paperwork on behalf of KOJC workers and arranged for the KOJC workers to be transported to a set

9

location for a sham marriage ceremony. Defendants CABACTULAN, DUENAS, and ESTOPARE paid legal and document-processing fees for the fraudulent immigration filings, using funds drawn from KOJC accounts. After KOJC workers who had entered into fraudulent marriages obtained United States citizenship, defendants CABACTULAN and DUENAS arranged for KOJC workers to divorce their respective spouses, so that they could then enter into fraudulent marriages with other KOJC workers who had not obtained United States permanent residency or citizenship.

    n. In order to perpetuate the appearance of legitimacy for the fraudulent marriages, defendant DUENAS possessed ATM cards to show immigration authorities that KOJC workers in the fraudulent marriages had joint banking accounts, and defendants CABACTULAN and DUENAS possessed male and female wedding rings for KOJC workers to use during fraudulent marriage ceremonies.

    o. Defendants CABACTULAN and DUENAS enrolled other KOJC workers at colleges in the United States. Defendants CABACTULAN and DUENAS then applied for such KOJC workers to obtain United States student visas in order for the KOJC workers to remain in the United States. Defendants CABACTULAN and DUENAS, and other known and unknown to the Grand Jury, completed and filed the college enrollment paperwork for those student visas. Defendants CABACTULAN, DUENAS, and ESTOPARE paid the tuition for those KOJC workers, using funds drawn from KOJC bank accounts. KOJC workers attended college approximately one day a week, but would otherwise spend their time soliciting money on behalf of KOJC.

    p. Defendants CABACTULAN and DUENAS, and others known and unknown to the Grand Jury, would coordinate the transfer of money

raised by KOJC workers to the KOJC Compound by either physically picking up the money at locations across the country, or by arranging for the money to be wire transferred to a KOJC member in the Philippines. Defendant ESTOPARE instructed KOJC workers to make cash deposits of less than $9,000 into bank accounts used for the wire transfers, in order to avoid detection from banks.

      q. For the money that was physically transferred to the KOJC Compound, defendant ESTOPARE, and others known and unknown to the Grand Jury, would provide KOJC workers approximately $9,000 in cash to carry when they returned to the Philippines. The money would be rolled into socks and placed in the luggage and on the person of KOJC members flying on commercial aircraft to the Philippines from the United States, or in bulk amounts stored in private jets operated by KOJC members.

      r. Money solicited in the United States, although advertised by KOJC and CJF as designated to aid impoverished Filipino children, would be used to directly finance KOJC operations in the Philippines and United States, as directed by certain individuals associated with KOJC, and the lavish lifestyle of KOJC leaders.

C.   OVERT ACTS

    14. In furtherance of the conspiracy, and to accomplish its objects, on or about the following dates, defendants CABACTULAN, DUENAS, and ESTOPARE, and others known and unknown to the Grand Jury, committed various overt acts within the Central District of California, and elsewhere, including, but not limited to, the following:

<u>Overt Act No. 1</u>: In or around May 2010, defendant CABACTULAN confiscated the passports of Victim C and her two children and stored

the documents at the KOJC Compound upon Victim C joining KOJC.

Overt Act No. 2: In or around 2013, defendant CABACTULAN confiscated the passport of Victim A and stored the document at the KOJC Compound upon Victim A's arrival in the United States to solicit donations as a KOJC worker.

Overt Act No. 3: On or about September 25, 2014, defendant DUENAS sent an email to other KOJC members, in which defendant DUENAS stated, "[A]ttached herewith is the list of FTW's [full time workers] bound to USA via LAX and SF and List of FTW's bound USA via JFK New York. I already sent to the tickets for FTW's via LAX and SF to [names omitted] . . . We will also send [yo]u later a series of probable questions and answers; just in case they will be ask by the immigration officer upon entry. Their answers must coincide with the office, just in case we receive an inquiry or call. We are finishing it now because [defendant CABACTULAN] will be answering the phone."

Overt Act No. 4: On or about October 24, 2014, defendant ESTOPARE sent an email titled "format" containing a Microsoft Excel spreadsheet for KOJC workers to report the amount of money raised.

Overt Act No. 5: On or about August 7, 2015, defendant DUENAS sent an email containing an attached document titled "MULTIPLE VISA FTMWS and THEIR AVE.docx" that included columns titled "Name in USA," "Status," "Ave.Income," and "Area." The columns contained a list of 93 KOJC workers, each KOJC worker's status in the United States, and the average money raised by each KOJC worker per day.

Overt Act No. 6: On or about October 11, 2015, defendant ESTOPARE sent an email to other KOJC members titled "2015 mob plan" that contained guidance for KOJC workers who were involved in soliciting funds for KOJC, including the drivers, coordinators, and

solicitors.

Overt Act No. 7:   On or about October 24, 2015, defendant ESTOPARE received an email from a KOJC group leader, with the subject line "OCTOBER2302115FR," providing a daily tally of money raised by KOJC workers of $2,777.

Overt Act No. 8:   On or about December 27, 2015, defendant ESTOPARE sent an email titled "names send thru moneygram" that provided the names of KOJC workers located in the Philippines that other KOJC workers were to wire transfer money to.

Overt Act No. 9:   On or about January 20, 2016, defendant DUENAS sent a template letter on KOJC letterhead to other KOJC members via email, addressed to the "Honorable Consul, United States of America." The "RE" line read, "RE: Invitation for [blank] as GUEST for the LIVE Concert Crusade in UNITED STATES OF AMERICA." The body of the letter stated that the person named in the "RE" line was "one of our special guest for this Kingdom's Concert Crusade, [and] his presence in the concert schedule is deemed important. Thus, the Kingdom's USA Chapter is sponsoring his stay in the country from [blank] to [blank] covering food and travel accommodation for the whole duration of the event."

Overt Act No. 10:   On or about March 28, 2016, defendant DUENAS applied for a United States F1 student visa on behalf of Victim H and enrolled her in college at the California University of Business and Technology in order for Victim H to remain in the United States and solicit on behalf of KOJC.

Overt Act No. 11:   In or around December 2016, defendants CABACTULAN and DUENAS, and others known and unknown to the Grand Jury, arranged for Victim B to marry another KOJC worker, who was a

United States citizen and with whom Victim B had no romantic relationship, for the sole purpose of enabling Victim B to obtain legal permanent resident status based on the marriage. In order to effectuate the marriage, defendant DUENAS, and others known and unknown to the Grand Jury, facilitated the completion of marriage paperwork on behalf of Victim B and arranged for Victim B to attend a marriage ceremony in Los Angeles, California.

Overt Act No. 12: On or about April 26, 2017, defendant DUENAS, and others known and unknown to the Grand Jury, facilitated the completion of a Form I-130, Petition for Alien Relative, on behalf of Victim B, based on Victim B's fraudulent marriage, in order for Victim B to obtain legal permanent resident status.

Overt Act No. 13: On or about March 27, 2018, defendants CABACTULAN and DUENAS refused to provide Victim C with her Green Card until Victim C wrote and signed a letter stating, among other things, that all of her work at KOJC was voluntary.

Overt Act No. 14: On or about June 19, 2018, defendant ESTOPARE, using a bank account in the name of "The Executive Pastor of the Kingdom of Jesus Christ TNAEN," paid $1,200 to Francis University for the tuition of Victim N.

Overt Act No. 15: On or about June 26, 2018, defendant CABACTULAN, using a bank account in the name of "The Executive Pastor of the Kingdom of Jesus Christ TNAEN," paid $2,450 to California University of Business and Technology for "Praya tuition fee."

Overt Act No. 16: On or about August 17, 2018, defendant CABACTULAN, using a bank account in the name of "The Executive Pastor of the Kingdom of Jesus Christ TNAEN," paid $1,375 to Liberty Legal Document Services for "[Victim O] – citizenship."

Overt Act No. 17:   On or about September 26, 2018, defendant ESTOPARE, using a bank account in the name of "The Executive Pastor of the Kingdom of Jesus Christ TNAEN-TN," paid $2,435 to Liberty Legal Document Services for the processing of immigration-related documents.

Overt Act No. 18:   On or about April 12, 2019, defendant DUENAS, using a bank account in the name of "Marissa A Duenas," paid $1,500 to Liberty Legal Document Services for "lawyers representation fee" for Victims N and P.

Overt Act No. 19:   On or about November 18, 2019, defendant DUENAS, using a bank account in the name of "KLC of Kern County," paid $400 to Francis University for the tuition of Victim N.

Overt Act No. 20:   On or about January 29, 2020, defendants CABACTULAN and DUENAS possessed approximately 72 Filipino passports, seven United States passports, and one Ukrainian passport in names other than the defendants, in an office at the KOJC Compound.

Overt Act No. 21:   On or about January 29, 2020, defendant DUENAS possessed approximately four male wedding rings and approximately three female wedding rings in an office at the KOJC Compound.

Overt Act No. 22:   On or about January 29, 2020, defendant DUENAS possessed a memorandum, dated March 6, 2018, titled "Financial Goal for 2018," that listed the total fundraising goal for KOJC in the United States as 23,050,000 Philippine Pesos.

Overt Act No. 23:   On or about January 29, 2020, defendant DUENAS possessed a file titled "Traitor" that contained information on KOJC members who fled from KOJC.

FORFEITURE ALLEGATION

[18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c)]

1. Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), in the event of any defendant's conviction of the offense set forth the sole count of this Indictment.

2. Any defendant so convicted shall forfeit to the United States of America the following:

    (a) all right, title, and interest in any and all property, real or personal, constituting, or derived from, any proceeds traceable to the offense; and

    (b) To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

3. Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), any defendant so convicted shall forfeit substitute property, up to the value of the property described in the preceding paragraph if, as the result of any act or omission of said defendant, the property

//
//
//

16

described in the preceding paragraph or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

A TRUE BILL

/s/
_____
Foreperson

NICOLA T. HANNA
United States Attorney

*Brandon Fox*

BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division

BENJAMIN R. BARRON
Assistant United States Attorney
Chief, Santa Ana Branch Office

DANIEL H. AHN
Assistant United States Attorney
Deputy Chief, Santa Ana Branch Office

JAKE D. NARE
Assistant United States Attorney
Santa Ana Branch Office